**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ X
EMILY CAPKANIS,                                       :
                                                      :     Civil Case No.: 20-cv-07144 (CM)(GWG)
                    Plaintiff,              :
                                                      :
      v.                                             :     **AMENDED COMPLAINT**
                                                      :
PRODIGY NETWORK LLC,                                  :
                                                      :     **Jury Trial Demanded**
                    Defendant.              :
------------------------------------------------------------ X

        Plaintiff Emily Capkanis ("Ms. Capkanis" or "Plaintiff") hereby alleges through her counsel, Wigdor LLP, as against Defendant Prodigy Network LLC ("Prodigy," the "Company" or "Defendant"), as follows:

## NATURE OF CLAIMS

        1.      Emily Capkanis was a successful employee for Prodigy.  Unfortunately, she also had to deal with her boss's advances.  Then Chief Operating Officer ("COO"), Vincent Mikolay ("Mr. Mikolay"), asked Ms. Capkanis to quit her job so they could date.  Ms. Capkanis protested to both Mr. Mikolay and the Company's Human Resources Department ("HR") that Mr. Mikolay should behave more "professionally."

        2.      Mr. Mikolay responded by falsely criticizing Ms. Capkanis's performance, stating, among other things, that she could not "stand on [her] own two feet."  The Company responded by transferring Ms. Capkanis to a series of alternate positions (she had been Mr. Mikolay's Executive Assistant) with increased workloads.

        3.      Within a matter of months, Ms. Capkanis had a medical crisis that required her to take job-protected leave.  Prodigy promptly fired Ms. Capkanis because of her disability and for taking the leave.  The Company claimed – falsely and contrary to the conclusions of Ms.

Capkanis's medical providers who cleared her to return to work – that Ms. Capkanis could not handle the "stress" of the job.

4. Prodigy's unlawful actions violated the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA"), the New York State Human Rights Law, Executive Law § 290 *et seq.* (the "Executive Law") and the Administrative Code of the City of New York § 8-107 *et seq.* ( the "City Law").

5. Ms. Capkanis seeks injunctive and declaratory relief, compensatory, punitive and liquidated damages and other appropriate equitable and legal relief pursuant to the FMLA, Executive Law and the City Law.

## JURISDICTION AND VENUE

6. The Court has jurisdiction over the FMLA claims pursuant to 28 U.S.C. § 1331.

7. The Court has jurisdiction over the Executive Law and City Law claims pursuant to 28 U.S.C. § 1367.

8. Pursuant to § 8-502(c) of the City Law, Plaintiff will cause to be served a copy of the Amended Complaint on the City of New York Commission on Human Rights and the City of New York Corporation Counsel.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the unlawful practices complained of herein occurred within the Southern District of New York.

## PARTIES

10. Ms. Capkanis is a resident of New York. She worked for Prodigy from December 24, 2017, until the Company fired her on June 12, 2019. At all relevant times herein, Plaintiff met the definition of an "employee" under all relevant statutes.

11. Upon information and belief, Defendant Prodigy is a corporation organized under the laws of the State of New York with headquarters in New York City. At all relevant times herein, Defendant met the definition of an "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

### Background

12. In 2011, Ms. Capkanis graduated *magna cum laude* from Drew University and earned a Bachelor of Arts degree in Studio Art with a minor in Sociology.

13. On or about December 24, 2017, Prodigy, a global real estate investment platform based in New York City, hired Ms. Capkanis as an Executive Assistant to Mr. Mikolay.

### Sexual Harassment

14. As Mr. Mikolay's assistant, Ms. Capkanis managed Mr. Mikolay's calendar, categorized his emails, coordinated travel accommodations for the executive team members, coordinated events and prepared and circulated meeting agendas.

15. Mr. Mikolay soon made clear that he expected more from Ms. Capkanis than professional tasks. In particular, Mr. Mikolay expressed an interest in a romantic relationship with Ms. Capkanis. For example, on one occasion, Mr. Mikolay touched Ms. Capkanis's leg in a meeting in his office. On another, he encouraged Ms. Capkanis to resign so more time would be available to date him.

16. Ms. Capkanis eventually made clear that she did not want to date Mr. Mikolay. In or about June 2018, she informed Mr. Mikolay that she did not "understand what [was] going on," that she "just want[ed] to be friends" and requested that he behave "more professionally."

17. Ms. Capkanis's rejection of Mr. Mikolay's romantic advances angered Mr. Mikolay. Mr. Mikolay stated that he no longer wished to work with Ms. Capkanis. Mr. Mikolay then issued a series of negative – and false – performance reports about Ms. Capkanis to

Camisha Hanna ("Ms. Hanna"), Prodigy's Head of HR.  For example, Mr. Mikolay told Ms. Hanna that Ms. Capkanis was "not good at [her] job," could "not stand on [her] own two feet" and "made a lot of mistakes."  Mr. Mikolay rated Ms. Capkanis's performance only a "2" out of "5."

18. Mr. Mikolay's low rating of Ms. Capkanis's performance did not make sense. Mr. Mikolay had never provided Ms. Capkanis with a performance review nor indicated to her that her performance was suffering.  To the contrary, Mr. Mikolay always praised Ms. Capkanis's work.

19. In July 2018, Ms. Capkanis reported Mr. Mikolay's harassment and retaliation to Prodigy through Ms. Hanna.  In particular, Ms. Capkanis informed Ms. Hanna that Mr. Mikolay had insisted he loved Ms. Capkanis, found Ms. Capkanis attractive and asked Ms. Capkanis to leave her job so they could date.  While telling Ms. Hanna that Mr. Mikolay's behavior made her nervous about her job, Ms. Capkanis began to cry.  Ms. Capkanis repeated that they needed to set professional boundaries.  Ms. Capkanis admitted to Ms. Hanna that Mr. Mikolay and Ms. Capkanis had met on two occasions several months ago outside the office and not during business hours.

20. On July 9, 2018, Ms. Hanna responded to Ms. Capkanis's complaints by thanking Ms. Capkanis for sharing her "story" and stating that she was "proud" of Ms. Capkanis for being "incredibly brave."  However, the Company neither investigated Ms. Capkanis's complaints nor took any meaningful remedial action.[1]

---

[1] In or about December 2018 and January 2019, Prodigy fired Mr. Mikolay and Ms. Hanna.  Neither, however, were fired because of the unlawful discrimination and retaliation Ms. Capkanis suffered.  Mr. Mikolay was fired because Prodigy believed he had stolen $2.5 million from the Company.  Ms. Hanna was fired for poor performance.

21.     Rather, in or about September 2018, Prodigy reassigned Ms. Capkanis to perform two jobs.  Ms. Capkanis was required to work in HR reporting to Ms. Hanna.  Ms. Capkanis was also required to report to Brian Newman, Vice President of Business Development.  Both of Ms. Capkanis's new supervisors were junior to Mr. Mikolay.

22.     While Prodigy gave Ms. Capkanis a $15,000 raise, Ms. Capkanis's workload doubled with the reassignment.

23.     After Mr. Mikolay and Ms. Hanna were dismissed, Prodigy reassigned Ms. Capkanis once again.  Ms. Capkanis was now required to perform services ranging from administrative to marketing, sales, finance, information technology and training.  For example, Ms. Capkanis researched demographical studies to back up the marketing team, as well as social media channel studies and sourcing influencers.  Ms. Capkanis also created sales collateral for new media for Company properties and analyzed budgets.

**Disability and Medical Leave**

24.     On April 3, 2019, Ms. Capkanis notified Emily Cohen ("Ms. Cohen"), Prodigy's Chief Marketing Officer and Ms. Capkanis's new boss, that she had to leave work for the day because of a medical condition.  Ms. Capkanis explained that she had suffered a "major anxiety attack and was throwing up."  Ms. Cohen responded by asking, "[w]as it work anxiety?"

25.     On April 4, 2019, Ms. Cohen herself arrived late due to an illness.  Ms. Capkanis also arrived late due to a weekly doctor's appointment.  When Ms. Cohen arrived, she confronted Ms. Capkanis angrily about a task that remained incomplete.  As Ms. Capkanis explained that the urgency of the task had not been clear to her, Ms. Capkanis's anxiety increased.  Ms. Capkanis finally had no choice but to ask to excuse herself for a moment.  Ms. Cohen pushed back on Ms. Capkanis's request and insisted on continuing to discuss the assignment.  Ms. Capkanis repeated that she needed to excuse herself for a moment, and Ms. Cohen relented.

26.     Shortly thereafter, Ms. Cohen emailed Shawnie Gupta ("Ms. Gupta"), Prodigy's new Head of HR, suggesting the termination of Ms. Capkanis's employment because of her disability.  Among other things, Ms. Cohen documented that Ms. Capkanis "had a severe physical reaction to anxiety," surmised that Ms. Capkanis was seeing a "therapist," and noted that Ms. Capkanis had a "standing doctor's appointment" every Thursday.  Ms. Cohen believed this was "more of an ongoing thing" and stated that she was "[n]ot sure [Prodigy] is the right environment for [Ms. Capkanis]."

27.     On April 5, 2019, based upon the recommendation of Ms. Capkanis's doctor, Ms. Capkanis requested a period of leave as an accommodation for her disability (bipolar disorder), which affects, among other things, the major life functions of concentrating, thinking, communicating and caring for herself.  Nonetheless, Ms. Capkanis could perform the essential functions of her job with the requested accommodation.

28.     Ms. Capkanis provided Ms. Gupta with contact information for her doctor to process the accommodation request.  Upon information and belief, Ms. Gupta did not reach out to Ms. Capkanis's therapist, or even return Ms. Capkanis's therapist's phone calls, for approximately ten days.

29.     On April 23, 2019, Ms. Capkanis was hospitalized because of her disability.  The facility removed access to Ms. Capkanis's phone.  Ms. Capkanis did not regain access to her cellphone, including email communications, until April 30, 2019.

30.     Prodigy eventually approved Ms. Capkanis's request for medical leave.[2]

---

[2]     Between mid-April, when Ms. Capkanis provided Ms. Gupta with her therapist's contact information, and April 30, when Ms. Capkanis regained access to her cell phone, Prodigy sent Ms. Capkanis two communications dated April 15 and April 26, requesting additional information regarding Ms. Capkanis's accommodation request.  Ms. Capkanis, of course, could not respond to these requests because of her hospitalization.  Moreover, Ms. Capkanis's therapist believed the requests were overbroad, as Prodigy sought more information than was necessary to

6

**Prodigy Fires Ms. Capkanis When She Tries to Return From Medical Leave**

31. Ms. Capkanis's condition improved, and her therapist cleared her to return to work as of June 12, 2019. For Ms. Capkanis's first week back, Ms. Capkanis's therapist recommended a limited scheduled so that Ms. Capkanis could transition back to work.

32. On June 5, 2019, Ms. Capkanis notified Ms. Gupta that she would return to work on June 12, 2019. Ms. Capkanis requested a "slightly limited schedule" as an accommodation, consistent with her therapist's recommendation.

33. Ms. Gupta became hostile. Ms. Gupta sent Ms. Capkanis an email asking, "[w]hat do you mean on a limited schedule?" Ms. Capkanis responded by explaining that "I have a program 3 times a week (mon-wed-fri) and will need to leave at 4:00 pm to make the program. I can come in early to make up for those days."

34. The following day, Ms. Capkanis received notifications that Ms. Gupta had rejected Ms. Capkanis's reimbursement requests for Ms. Capkanis's cellphone data plan – even though Prodigy had agreed to cover such expenses when Ms. Capkanis began working for the Company in 2017.

35. Around the same time, Prodigy published an advertisement on LinkedIn for Ms. Capkanis's replacement.

36. Ms. Gupta called Ms. Capkanis on June 7, 2019 to talk about Ms. Capkanis's return to Prodigy. Ms. Gupta presumed, without any medical basis, that Ms. Capkanis "wouldn't be able to handle a stressful job with the marketing team" and stated that Prodigy "need[ed] to transfer [Ms. Capkanis] to a different position in the company." Ms. Gupta admitted that she did

---

consider Ms. Capkanis's request. Nonetheless, Ms. Capkanis's therapist remained in contact with Ms. Gupta and ultimately provided the information necessary for Prodigy to approve Ms. Capkanis's leave.

not want to assign Ms. Capkanis to a new position only to find out that Ms. Capkanis "can't handle it."

37. Ms. Gupta's assumption that Ms. Capkanis could not perform her duties was false. Ms. Capkanis told Ms. Gupta she was feeling "better," "[she] can handle the work that [she is] given" and that "[she] need[s] to come back to work."

38. Ms. Gupta, however, made it clear to Ms. Capkanis that her supervisor, Ms. Cohen, no longer wanted to work with Ms. Capkanis. Ms. Gupta admitted that Prodigy had no plan to transition Ms. Capkanis back to work and suggested that no other positions were available because of a purported "hiring freeze."

39. Ms. Gupta emailed Ms. Capkanis on June 11, 2019 to arrange a phone call for the next day. Ms. Capkanis asked whether Ms. Gupta intended for Ms. Capkanis to return to work the next morning. Ms. Gupta responded, "At the moment no. You need to call me to discuss your options."

40. On June 12, 2019 – the day Ms. Capkanis was scheduled to return to work – Ms. Gupta fired her.

**FIRST CAUSE OF ACTION**
**(Interference and Retaliation in Violation of FMLA)**

41. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 40 of this Amended Complaint as if fully set forth herein.

42. By the acts and practices described above, Defendant interfered with, restrained and denied Plaintiff her rights under the FMLA, and retaliated against her for exercising those rights, in violation of the FMLA, 29 U.S.C. §§ 2612(a), 2614(a)(1) and 2615(a)(1).

43. Defendant's unlawful actions were willful.

## SECOND CAUSE OF ACTION
**(Discrimination in Violation of Executive Law)**

44. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 43 of this Amended Complaint as if fully set forth herein.

45. By the acts and practices described above, Defendant discriminated against Plaintiff in the terms and conditions of her employment on the basis of her sex and disability in violation of the Executive Law.

46. As a result of Defendant's discriminatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress and other compensable damage unless and until this Court grants relief.

## THIRD CAUSE OF ACTION
**(Retaliation in Executive Law)**

47. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 46 of this Amended Complaint as if fully set forth herein.

48. By the acts and practices described above, Defendant retaliated against Plaintiff for protesting sex discrimination and requesting a reasonable accommodation in violation of the Executive Law.

49. Plaintiff is now suffering irreparable injury and monetary damage from Defendant's retaliatory conduct and will continue to do so unless and until the Court grants relief.

## FOURTH CAUSE OF ACTION
**(Discrimination in Violation of City Law)**

50. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 49 of this Amended Complaint as if fully set forth herein.

51. Defendant discriminated against Plaintiff in the terms and conditions of her employment based on her sex and disability in violation of the City Law.

52. As a result of Defendant's discriminatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress and other compensable damage unless and until this Court grants relief.

## FIFTH CAUSE OF ACTION
### (Retaliation in Violation of City Law)

53. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 52 of this Amended Complaint as if set forth herein.

54. By the acts and practices described above, Defendant retaliated against Plaintiff for protesting sex discrimination and requesting a reasonable accommodation in violation of the City Law.

55. Plaintiff is now suffering irreparable injury and monetary damage from Defendant's retaliatory conduct and will continue to do so unless and until the Court grants relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, in her favor and against Defendant, that this Court enter a Judgment:

(a) declaring the acts and practices complained of herein to be violations of the FMLA, the Executive Law and the City Law;

(b) enjoining and permanently restraining these violations of the FMLA, the Executive Law and the City Law;

(c) directing Defendant to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect Plaintiff's employment opportunities;

(d) directing Defendant to place Plaintiff in the position she would have occupied but for Defendant's discriminatory and retaliatory treatment of her, and making her whole for all

earnings and other benefits she would have received but for Defendant's discriminatory and retaliatory treatment, including but not limited to wages, pension and other lost benefits;

  (e) directing Defendant to pay Plaintiff an additional amount as liquidated damages for violations of the FMLA;

  (f) directing Defendant to pay Plaintiff compensatory damages, including damages for emotional distress, humiliation and pain and suffering;

  (g) directing Defendant to pay Plaintiff additional amounts as punitive damages;

  (h) awarding Plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

  (i) awarding Plaintiff the costs of this action, together with reasonable attorneys' fees, as provided by the FMLA and by the City Law; and

  (j) awarding such other and further relief as this Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Dated: September 14, 2020
   New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
   Valdi Licul

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
vlicul@wigdorlaw.com

*Counsel for Plaintiff*